# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

MAVIS HARTMAN; ROGER
HARTMAN; and MAUL LEE
HARTMAN,

      Plaintiffs,

v.

                          **Memorandum of Law & Order**
                          Civil File No. 09-01618 (MJD/RLE)

BRIAN J. SMITH; JENNIFER SMITH;
MIDWEST EQUITY CONSULTANTS,
INC., a Minnesota corporation; MIDWEST
EQUITY CONSULTANTS, INC., an Illinois
Corporation; and PRIME SECURITY BANK,

      Defendants.

Jeramie Richard Steinert, Steinert P.A., Counsel for Plaintiffs.

Campbell Knutson, Counsel for Defendant Prime Security Bank.

Defendant Brian J. Smith, *pro se*. Defendant Jennifer Smith, *pro se*.

Defendant Midwest Equity Consultants, Inc., no representation, default.

## I.    INTRODUCTION

      This matter is before the Court on Defendant Prime Security Bank's

Motion for Summary Judgment [Docket No. 21] and Plaintiffs' Motion for Partial

Summary Judgment [Docket No. 30]. Plaintiffs filed a Complaint alleging that Defendants targeted them with a predatory, deceptive, and fraudulent lending scheme aimed at stripping equity in their home. The Court heard oral argument on the cross motions for summary judgment on August 6, 2010.

## II.    FACTUAL BACKGROUND

Plaintiffs Mavis Hartman and Roger Hartman (collectively "the Hartmans") have been married for 43 years, and Plaintiff Maul Lee Hartman is their daughter. All Plaintiffs currently reside at 1031 74th Street, Victoria, Minnesota (hereinafter "the Subject Property"); however, Maul Lee Hartman lived at 8320 Rhoy Street, Victoria, Minnesota at all material times in this case.

Prior to the construction of the home on the Subject Property, the Hartmans lived in a home on the adjacent property, 1041 74th Street, which Roger Hartman built in 1976. In 1988, the City of Victoria issued the Hartmans a building permit to construct a building on the Subject Property for non-residential uses only. Roger Hartman, however, constructed a single family home and reported it to the City of Victoria as an out-building with no separate street address. Around 1990, Roger Hartman moved into the structure on the Subject Property.

On June 23, 2006, the Hartmans filed an official plat with Carver County called "Hartman Addition Plat 3" that identifies the Subject Property as Block 1, Lot 2.  (Steinert Aff. Ex. U.)  The Subject Property is listed exclusively in Mavis Hartman's name on this official plat.  Shortly thereafter, on August 3, 2006, Mavis Hartman signed and delivered to Maul Lee Hartman a quitclaim deed for the Subject Property: "Block 1 Lot 2 Hartman Addition Plat 3."  The quitclaim deed was filed the same day with the Office of the Registrar of Titles in Carver County, Minnesota.

In August 2006, the Hartmans applied for a permit to build a 2,200 square foot addition to the Subject Property and prepared to sell 1041 74th Street.  By January 2007, the Hartmans sold 1041 74th Street, but still needed additional financing to complete the addition to the Subject Property.  Roger Hartman was unable or unwilling to obtain a loan from a bank based upon his own credit, so his lawyer at the time put him in contact with Defendant Brian Smith and Smith's company, Defendant Midwest Equity Consultants, Inc. ("Midwest Equity").  At the time, Midwest Equity was engaged in the business of securing loans for financially distressed clients through a third-party lender and Anchor Bank.  The parties obtained an appraisal that listed Roger Hartman as the

"Borrower" and Anchor Bank as the "Lender/Client," and valued the Subject Property at $2.5 million.

Over the course of 2007, the parties in this case entered into multiple lending arrangements that are described in more detail below. Roger Hartman negotiated each transaction with Brian Smith. Mavis Hartman and Maul Lee Hartman only attended the closings during this time period to execute the necessary documents.

On February 21, 2007, the parties entered into three agreements. First, the Hartmans and Maul Lee Hartman executed and delivered a warranty deed to Brian Smith, transferring title to the Subject Property for consideration of $280,000. Second, Brian Smith and his wife Jennifer Smith (collectively "the Smiths") obtained a loan from Anchor Bank in the amount of $280,000 and placed a mortgage on the Subject Property for that amount. Third, the Smiths and Plaintiffs entered into a Contract for Deed in the principal amount of $280,000 to re-convey the Subject Property to Mavis and Maul Lee Hartman. The agreement stated that the Hartmans (as buyers) consented to Smith's mortgage of the Subject Property in an amount up to the principal amount of the Contract for Deed. The Hartmans were to pay monthly interest payments at an annual rate of 12.5% over twenty months, and then make a balloon payment in full of

4

the principal.  To make interest payments, Smith established an escrow account

with $23,333.33 of the proceeds.

The $280,000 was disbursed with $9,300.00 going to Midwest Equity

Consultants as fees for services, $11,048.50 for miscellaneous closing costs,

$23,333.33 into an escrow account to make interest payments on the Contract for

Deed, $21,922.66 to satisfy encumbrances on the title, $106,634.60 to pay

contractors, and $107,760.91 as cash proceeds to the Hartmans.  The cash

proceeds were used to pay subcontractors and suppliers relating to the on-going

construction to the addition on the Subject Property.

According to Roger Hartman, he understood that his family had to sign

over the deed to Smith to obtain the mortgage, and after the mortgage was

closed, they would get it signed back to them.  He claims further that he did not

understand what a Contract for Deed was, and that he had not seen the actual

agreement until after the closing.

Roger Hartman testified at his deposition that, after the February closing,

Brian Smith informed him of a mistake made on the mortgage and that the

principal payment would actually balloon in four to six months rather than in

twenty months.  This conflicts, however, with other testimony in his deposition

that he contacted Smith to request more money.  In any case, Hartman was

unable to pay off the balloon payment early and the parties therefore entered

into a new set of agreements, including a loan application on August 1, 2007, to

implement the necessary modifications.

The new loan application listed Brian Smith and Roger Hartman as

applicant and co-applicant respectively.  The principal amount was increased to

$495,500 and the parties switched to a new bank, Defendant Prime Security Bank

("Prime").  According to the loan presentation report given by Scott Burger of

Prime, loan proceeds were to be used towards satisfying the Anchor Bank

mortgage, with the remainder going to Roger Hartman.  The presentation report

informed the loan committee that Brian Smith was the 60% owner and president

of Midwest Equity and that Smith had additional property owned under the

same situation.  It also indicated that the Subject Property was valued at $2.5

million.  Burger's loan presentation report described Midwest Equity's role as

follows:

> Midwest Equity is a company that brokers sales of properties with
> adequate equity in which the owners are past due or near
> foreclosure on the property.  Midwest Equity basically matches up a
> strong investor with the homeowner in trouble and does a transfer
> of title.  Immediately after the transfer, the two parties enter into a
> contract for deed arrangement that allows the original owner to
> make a reduced payment each month with a pre-agreed pro rata
> share of the remaining payment to come from the interest reserve
> account.  The original owner is then afforded time to get their

> financial health in order and upon maturity of the note refinances and pays off the bank note via the secondary market.  This particular company has been reviewed by the Minnesota Attorney General's office and has been give [sic] its blessing as it pertains to "predatory" lending violations.  In addition, Anchor Bank's legal counsel reviewed all documents and practices of Midwest Equity and found no issues.

(Prime Loan Presentation at 2-3.)

The parties created another interest reserve escrow account from proceeds of the transaction to pay monthly interest payments on the Contract for Deed. The escrow account was pledged by the Plaintiffs to the Smiths and by the Smiths to Prime as collateral through a Pledge Agreement signed by Mavis Hartman, Maul Lee Hartman, Brian Smith and Prime.  The agreement was signed "[t]o induce Brian J. Smith (including successors and assigns, the "Lender") … to make loans, extend or continue credit or some other benefit … to Mavis Hartman and Maul Lee Hartman."  (Pledge Agreement at 1.)  Brian Smith signed the Pledge Agreement as "lender" and Scott Burger signed on behalf of Prime.

Aside from the Pledge Agreement, the parties entered into four additional contracts on August 1, 2007.  First, the Smiths and Mavis and Maul Lee Hartman amended the Contract for Deed to increase the principal amount from $280,000 to $495,500.  Second, the Smiths obtained a new mortgage loan for $495,500 from Prime and satisfied the prior $280,000 mortgage in favor of Anchor Bank.

Plaintiffs joined in the Prime Mortgage as they had agreed to do under the terms of the Smith Contract for Deed.  Third, the Smiths and Plaintiffs signed an assignment of the Contract for Deed to Prime for security purposes.  Finally, Brian Smith signed a $495,500 promissory note to Prime.

According to the Disbursement Request and Authorization, the loan was taken out with Prime for personal, family or household purposes or personal investment.  (Steinert Aff. Ex. Q, Disbursement Request and Authorization at 2.)  The specific stated purpose of the loan was for a cash out refinancing of the Subject Property.  (Id.)

In connection with the August 1, 2007 Smith/Hartman closing, the $495,500 was disbursed with $275,737.98 used to pay off the Anchor Bank Mortgage, $4,995.00 to Midwest Equity as fees for services, $9,280.85 as miscellaneous closing costs, $49,051.57 into an escrow account to make interest payments on the Contract for Deed, $4,650.00 into a real estate tax escrow, and $151,784.60 as cash proceeds to the Hartmans.  The cash proceeds were used to pay subcontractors and suppliers relating to the on-going construction of the addition on the Subject Property.

On November 13, 2007, the parties entered into another round of modifications to the lending relationship.  Plaintiffs claim that they were asked to

8

sign a modification whereas Defendant Prime asserts that the Hartmans needed

additional funds in connection with the construction of the Subject Property.

Regardless, the Smiths, and Mavis and Maul Lee Hartman amended the Contract

for Deed to increase the principal amount from $495,500 to $664,000.  The Smiths

increased their note and mortgage with Prime from $495,500 to $664,000 and

Plaintiffs joined in the modified mortgage.  The $664,000 was disbursed with

$495,500 to pay off the existing Prime mortgage, $4,990.00 to Midwest Equity as

fees for services, $4,713.30 as miscellaneous closing costs, $22,794.98 added to the

escrow for the Contract for Deed payments, $35,000.00 to satisfy an outstanding

judgment against the Subject Property, and $101,001.72 as cash proceeds to the

Hartmans.  The cash proceeds were again used primarily to pay contractors and

material suppliers relating to the construction of the addition on the Subject

Property.

When May 2008 approached, Plaintiffs attempted to extend the time that

they needed to pay back Smith and Prime.  Plaintiffs claim that when they

expressed the desire to seek financing elsewhere, Scott Burger threatened to

immediately foreclose on the property.  On June 26, 2008, after Plaintiffs failed to

make payments toward the Contract for Deed, the Smiths served a statutory

Notice of Cancellation of the Contract for Deed.  On August 15, 2008, Plaintiffs

mailed letters to Defendants cancelling and rescinding all transactions relating to

the Subject Property.  Prime wrote back stating that the bank could not rescind

because it had no transactions or dealings with Plaintiffs.

On November 25, 2008, Prime served and filed its Notice of Foreclosure

Sale because the Smiths stopped making payments on the mortgage.  It initially

scheduled the sheriff's sale for January 21, 2009, but agreed to postpone the sale

until February 10, 2009, at which time Prime bid the amount due on its mortgage

and purchased the Subject Property for $707,947.54.  Plaintiffs, however,

continue to occupy the Subject Property.

## III.    PROCEDURAL BACKGROUND

On June 24, 2009, Plaintiffs filed a thirteen count Complaint, seeking

numerous forms relief under a number of different theories.  Under Count 1,

Plaintiffs seek a declaratory judgment that the warranty deed signed by Plaintiffs

and the corresponding Contract for Deed constituted an equitable mortgage

under Minnesota law.  Under Count 2, Plaintiffs seek rescission and damages

from all Defendants for alleged violations of the Truth in Lending Act ("TILA"),

15 U.S.C. § 1601 *et seq* and Home Owner Equity Protection Act ("HOEPA") 15

U.S.C. § 1639.  Under Count 3, Plaintiffs seek statutory damages, exemplary

damages, and attorney fees against Midwest Equity for alleged violations of the

Foreclosure Consultant Statute, Minn. Stat. §§ 325N.01-09.  Under Count 4,

Plaintiffs seek damages against Defendants Brian Smith and Jennifer Smith for

alleged violations of the Foreclosure Purchaser Statute, Minn. Stat. § 325N.10.

Under Count 5, Plaintiffs seek rescission, pursuant to Minn. Stat. § 325N.13, of

any contract they entered into with Brian Smith and Jennifer Smith, and return of

any consideration the Smiths received as a result of the transactions.  Under

Count 6, Plaintiffs seek damages and equitable relief against Defendants Brian

and Jennifer Smith for alleged violations of the Consumer Fraud Act, Minn. Stat.

§ 325F.68 Subd. 2.  Under Count 7, Plaintiffs seek damages, attorney fees, costs

and equitable relief against Defendants Brian and Jennifer Smith for alleged

violations of the Uniform Deceptive Trade Practices Act, Minn. Stat. 325D.44.

Under Count 8, Plaintiffs seek equitable relief under a theory of unjust

enrichment against the Smiths and Midwest Equity.  Under Count 9, Plaintiffs

seek equitable relief against the Smiths under a theory of unconscionability.

Under Count 10, Plaintiffs seek damages against all Defendants under a theory

of Common Law Fraud.  Under Count 11, Plaintiffs seek damages against the

Smiths for originating a mortgage loan with points and fees in excess of 5%, in

violation of Minn. Stat. § 58.137, subd. 1.  Under Count 12, Plaintiffs seek

damages, attorney fees, costs, and equitable relief against the Smiths and

Midwest Equity for allegedly originating a mortgage loan in violation of

standards of conduct Minn. Stat. § 58.13.  Finally, under Count 13, Plaintiffs

merely state that they are bringing a private right of action under Minn. Stat.

§ 8.31 for alleged violations of Minn. Stat. §§ 58.13, 58.136, 58.137, and 58.16.

Defendant Prime filed an Answer to the Complaint on July 21, 2009,

stating affirmative defenses that Plaintiffs claims are barred in part or in whole

by the respective statute of limitations and the doctrine of laches.  Defendants

Brian Smith and Jennifer Smith filed an Answer to the Complaint on July 29,

2009, also stating affirmative defenses that Plaintiffs' claims are barred for failure

to state a claim upon which relief may be granted, and failure in consideration,

breach of contract, estoppel, waiver, laches, accord and satisfaction, and the

doctrine of unclean hands.  They also filed a counterclaim for unjust enrichment

due to Plaintiffs remaining in the home after the cancellation of the Contract for

Deed.

On October 14, 2009, the Clerk of the Court entered Default as to Midwest

Equity Consultants, Inc. (a Minnesota corporation), and Midwest Equity

Consultants, Inc. (an Illinois corporation) [Docket No. 11] based on a failure to

answer the Complaint by counsel.

On April 22, 2010, Defendant Prime filed a Motion for Summary Judgment [Docket No. 21] on all claims filed against it.  Plaintiffs responded, stating that the only claims asserted directly against Prime are counts 2 and 10.  On May 14, 2010, Plaintiffs filed a Motion for Partial Summary Judgment against all Defendants [Docket No. 30] on Counts 1, 2, 4, 10, and 11, as well as on the Smiths' counterclaim.   In conjunction with their motion, Plaintiffs request an Order granting their costs and disbursements, and leave to file a separate application for reasonable attorney fees.  Despite being served with all dispositive motions and the associated filings, Defendants Brian Smith, Jennifer Smith and Midwest Equity have not made any filings with this Court, nor have they responded to discovery requests, interrogatories, or requests for admissions made by Plaintiffs on February 10, 2010.

## IV.    DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate

when "there is no dispute of fact and where there exists only one conclusion."

Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

"Only disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Factual disputes that

are irrelevant or unnecessary will not be counted. (Id.)  The court must view the

evidence, and the inferences that may be reasonably drawn from it, in the light

most favorable to the non-moving party.  Graves v. Arkansas Dep't. of Fin. &

Admin., 229 F.3d 721, 723 (8th Cir. 2000).  "[I]n ruling on a motion for summary

judgment, the nonmoving party's evidence 'is to be believed, and all justifiable

inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S.

541, 552 (1999).

### B.  Count 1: Declaratory Judgment of Equitable Mortgage

Plaintiffs argue that the February 21, 2007 Contract for Deed should be

treated as an equitable mortgage.  Prime takes no position on this issue and the

Smiths have failed to respond.

Courts generally presume that a deed is a conveyance.  Ministers Life &

Cas. Union v. Franklin Park Towers Corp., 239 N.W.2d 207, 210 (Minn. 1976).

14

However, Minnesota courts have adopted the doctrine of "equitable mortgage" "to prevent any overreaching by one party which would unfairly exploit the other party's financial position or relative lack of experience in real estate dealings." Id. Essentially, if "the real nature of the transaction between the parties is that of a loan, advanced upon the security of realty granted to the party making the loan, it may be treated as an equitable mortgage." First Nat'l Bank of St. Paul v. Ramier, 311 N.W.2d 502, 503 (Minn. 1981). The intent of the parties is paramount, and to overcome the presumption that a deed is a conveyance, it must be clear that both parties intended that the transaction result in a mortgage. Ministers Life & Cas. Union, 239 N.W.2d at 210.

In order to determine intent, courts may look to the documents relating to the transaction. Id. The lack of terms such as "debt," "security," or "mortgage" are strong evidence indicating that the transaction is not a mortgage. Id. However, the fact that documents do not express the existence of a loan is not conclusive, and the intention of the parties is to be ascertained by looking at "all the facts and circumstances surrounding a transaction." Gagne v. Hoban, 159 N.W.2d 896, 899 (Minn. 1968). "In the final analysis, the question of whether the parties to a conveyance really intended it to be absolute or security for indebtedness is for the triers of fact." Id. at 900. The true inquiry is whether the

parties intended an *outright* sale or whether the "purpose and effect of the transaction is to give security on real property for a debt." Id. at 899.

The underlying agreements in this case initially suggest an issue of fact regarding intent.  For instance, the Contract for Deed specifically identifies Brian Smith and Jennifer Smith as "Seller" and Mavis Hartman and Maul Lee Hartman as "Purchaser."  (Roger Hartman Dep. Ex. 6.)  Similarly, the Warranty Deed states that "FOR VALUABLE CONSIDERATION, Mavis Hartman and Roger Hartman, husband and wife, and Maul Lee Hartman, unmarried, Grantor, hereby conveys and warrants to Brian J. Smith, Grantee."  (Id. Ex. 5.)  On the other hand, the February 21, 2007 Independent Contract Agreement for Escrow Agent Services represented that Midwest Equity "is engaged in the business of securing 'New Loan Programs' for financially distressed 'Clients' through a third-party lender and ANCHOR BANK."  (Steinart Aff. Ex. I.)  Also, the appraisal performed shortly before the closing lists Roger Hartman as the "Borrower" and "owner" of the Property and that the "only function of the appraisal is to assist the client mentioned in this report in evaluating the subject property for lending purposes."  (Id. Ex. J.)

Plaintiffs insist, however, that the Court should ignore these apparent differences in light of admissions made by the Smiths during discovery.

"[Federal Rule of Civil Procedure 36] provides that a party, within the permissible scope of discovery under the rules of civil procedure, may serve on any other party a written request to admit the truth of any matters relating to, *inter alia*, facts or the application of law to fact." Quasius v. Schwan Food Co., 596 F.3d 947, 950 (8th Cir. 2009) (citing Fed. R. Civ. P. 36).  "'A matter is admitted' unless the party to whom the request is directed serves a written answer or objection within thirty days, or such shorter or longer period as may be ordered by the court."  Id. at 950-951 (citing Fed. R. Civ. P. 36(a)(3)). "When a matter is admitted, it is 'conclusively established' for purposes of the action, 'unless the court, on motion, permits the admission to be withdrawn or amended.'"  Id. (quoting Fed. R. Civ. P. 36(b)).  "If facts that are admitted under Rule 36 are 'dispositive' of the case, then it is proper for the district court to grant summary judgment."  Id. (citing Moosman v. Joseph P. Blitz, Inc., 358 F.2d 686, 688 (2d Cir. 1966)).

After Plaintiffs served its requests for admission, the Smiths never asked the Court to adjust the normal time for response under Rule 36(a)(3) and failed to respond within the thirty days specified in the rule.  Consequently, the matters specified in Plaintiff's requests of February 2, 2010 are admitted and conclusively established against the Smiths.  These include the following admissions:

17

REQUEST NO. 12: Admit Plaintiffs assigned escrow proceeds to Brian J. Smith on February 21, 2007 in order to induce the latter to make a loan to Plaintiffs.

REQUEST NO. 13: Admit Plaintiffs executed the Warranty Deed to Brian J Smith as security for a debt, and not deed absolute.

REQUEST NO. 14: Admit that as part of the February 2007 Transaction, Plaintiffs did not intend to convey, and Brian J. Smith did not intend to receive, a deed absolute to the Property for the sum of $280,000.

(Steinert Aff. Ex. V.)  These admissions conclusively establish that the Hartman/Smith transaction was intended to be a loan.

In addition to looking to the intent of the parties, courts will also consider the following factors in making a determination as to whether a conveyance should be construed as an equitable mortgage: 1) the disparity between the value of the property and the price paid; 2) the nature of the solicitation that gave rise to the transaction; 3) attempts to sell the property on the open market; 4) whether there was a negotiated sale price; and 5) whether there was continuous occupancy.  Brown v. Grant Holding, LLC., 394 F. Supp.2d 1090, 1098-99 (D. Minn. 2005).

Turning to the Brown factors, the Court concludes that they also weigh in favor of finding an equitable mortgage.  The vast disparity between the Subject Property's sale price of $280,000 and the appraised value of $2.5 million suggests

that the transaction operated as a loan.  See Jones v. Rees-Max, LLC, 514 F. Supp. 2d 1139, 1146 (D. Minn. 2007) (holding that a disparity of $278,000 in value and purchase price of $214,000 was large enough to weigh in favor of equitable mortgage).  The nature of the solicitation involved frequent assurances from Smith that this arrangement would allow them to keep their home.  The home was never placed on sale in the open market.  There was no negotiated sale price, but rather an amount of money needed for the Plaintiffs' financial needs at the time.  Plaintiffs continued to occupy the premises upon executing the Contract for Deed and continued to pay real property taxes and homeowner's insurance as a part of their monthly payments.  Finally, Plaintiffs made post-conveyance improvements to the property.

In light of these facts, the Smiths' admissions, and Prime's failure to state a position on this issue, the Court finds it appropriate to enter a declaratory judgment that the agreements the Smiths and Plaintiffs entered into on February 21, 2007 constituted an equitable mortgage.

### C.  Count 2: TILA & HOEPA Rescission and Damages

Plaintiffs and Prime have filed cross motions for summary judgment on Plaintiffs' TILA claims for rescission and damages and Plaintiffs' HOEPA damages claim.

### 1. TILA Rescission

Under the TILA, "when a loan made in a consumer credit transaction is secured by the borrower's principal dwelling, the borrower may rescind the loan agreement if the lender fails to deliver certain forms or to disclose important terms accurately." Beach v. Ocwen Fed. Bank, 523 U.S. 410, 412 (1998) (citing 15 U.S.C. § 1635). Essentially, each obligor has a right to receive material disclosures such as the annual percentage rate, the finance charge, the amount financed, the total of payments, the payment schedule, and the disclosure and limitations referred to in § 226.32(c) and (d). 15 U.S.C. §§ 1631(a), 1632(a).

The time limit for an obligor's exercise of his or her right of rescission "shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first." 15 U.S.C. § 1635(f). Prime contends that Plaintiffs' claim for rescission is untimely because they filed their Complaint after the foreclosure sale. The Court, however, disagrees with Prime's assumption that a plaintiff must file a lawsuit in order to exercise their right of rescission. "To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication." 12 CFR 226.23(a)(2). "Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when

delivered to the creditor's designated place of business." <u>Id.</u>  In this case,

Plaintiffs' August 2008 Rescission Letter was within the three-year rescission

period and well before the February 2009 foreclosure sale.  As a result, Plaintiffs'

claim is not barred by section 1635(f).

Prime argues next that Plaintiffs do not hold any TILA rescission rights in

this matter because none of them satisfy the definition of a "consumer" in a

consumer credit transaction under 15 U.S.C. § 1635.

According to 15 U.S.C. §1602(h) "[t]he adjective 'consumer,' used with

reference to a credit transaction, characterizes the transaction as one in which the

party to whom credit is offered or extended is a natural person, and the money,

property, or services which are the subject of the transaction are primarily for

personal, family, or household purposes."  The relevant federal regulations

elaborate on a consumer's right to cancel as follows:

> In a credit transaction in which a security interest is or will be
> retained or acquired in a consumer's principal dwelling, each
> consumer whose ownership interest is or will be subject to the
> security interest shall have the right to rescind the transaction,
> except for transactions described in paragraph (f) of this section.

12 CFR § 226.23(a)(1).  The regulations go on to broadly define the word

"consumer" in rescission cases:

> Consumer means a cardholder or natural person to whom consumer credit is offered or extended. However, for purposes of rescission under §§ 226.15 and 226.23, the term also includes a natural person in whose principal dwelling a security interest is or will be retained or acquired, if that person's ownership interest in the dwelling is or will be subject to the security interest.

12 C.F.R. § 226.2(a)(11).  The Official Staff Commentary explains:

> For purposes of rescission under §§ 226.15 and 226.23, a consumer includes any natural person whose ownership interest in his or her principal dwelling is subject to the risk of loss. Thus, if a security interest is taken in A's ownership interest in a house and that house is A's principal dwelling, A is a consumer for purposes of rescission, even if A is not liable, either primarily or secondarily, on the underlying consumer credit transaction.

Official Staff Commentary to 12 C.F.R. § 226.2(a)(11)-2.  Based on these

definitions, the Court concludes that a plaintiff qualifies as a consumer in a TILA

rescission case if she holds an ownership interest in her principal dwelling that is

subject to the security interest.  See also Scott v. Long Island Sav. Bank, 937 F.2d

738, 741 (2d Cir. 1991) (affirming dismissal of TILA rescission claim because the

property was not the plaintiff's principal dwelling).

In this case, however, neither Roger Hartman nor Mavis Hartman held an

ownership interest in the Subject Property at the time of the transactions at issue

here.  They placed fee title to the Subject Property in Mavis Hartman's name on

June 23, 2006, and Mavis Hartman transferred that ownership interest to Maul

Lee Hartman by a quitclaim deed on August 3, 2006.  Moreover, by treating the

February 2007 transaction as an equitable mortgage, Maul Lee remained the sole

owner of the Subject Property after November 13, 2007, subject to the Smith

equitable mortgage and the Prime mortgage.  Therefore, at all material times in

this case, Maul Lee Hartman was the sole owner of the Subject Property.  As a

result, Plaintiffs Roger Hartman and Mavis Hartman could never rescind because

they did not have the requisite ownership.  Further, because the Subject Property

was not Maul Lee Hartman's principal dwelling at the time of these transactions,

she also did not have a right of rescission under the TILA.  Accordingly,

Defendants are entitled to summary judgment on Plaintiffs' TILA rescission

claim and Plaintiffs' motion is correspondingly denied.

## 2.  TILA Damages Claims

The TILA provides for statutory penalties if a creditor does not make

material disclosures under section 1631 and also if a creditor fails to comply with

rescission under section 1635.  15 U.S.C. § 1640(a).  A claim for damages for a

TILA violation must be commenced within one year from the date of the

occurrence of the violation.  15 U.S.C. § 1640(e).

In this case, Plaintiffs seek TILA damages under two separate legal

theories.  First, Plaintiffs argue that Defendants' failed to comply with their

rescission letter within 20 calendar days after receipt, thereby violating section 1635.  As discussed above; however, Plaintiffs were never entitled to such compliance and therefore have no basis for this TILA damages claim.

Second, Plaintiffs argue that they are entitled to damages due to Defendants' failure to make material disclosures at the time of the transactions at issue here.  Prime argues that Plaintiffs' claim is barred because the last alleged violation occurred on November 13, 2007 but Plaintiffs did not initiate this action until June 24, 2009, more than one year later.  Plaintiffs respond, arguing that the statute of limitations is tolled here because Prime fraudulently concealed usage of money from the transaction.

To date, the Eighth Circuit has not decided whether the one-year statute of limitations may be tolled due to a creditor's fraudulent concealment of a TILA violation.  In Evans v. Rudy-Luther Toyota, Inc., however, the court held that the Eighth Circuit would likely follow other circuits that allow equitably tolling under such a scenario. 39 F. Supp. 2d 1177, 1179 (D. Minn. 1999).  To establish fraudulent concealment, the plaintiff must show:

> 1) that the Defendant engaged in a course of conduct to conceal evidence of the Defendant's alleged wrongdoing; and 2) that the Plaintiff failed to discover facts giving rise to her claim despite the exercise of due diligence.

Id. at 1184 (citing Schaefer v. Ark. Med. Soc'y, 853 F.2d 1487, 1491-92 (8th Cir. 1988)).  Where the allegations involve a failure to make TILA disclosures, the court requires of concealment independent of the missing disclosures:

> [t]o hold that the Defendant' failure to make the disclosures required by TILA was, in and of itself, an act of fraudulent concealment, would effectively nullify the one-year limitations period that was enacted by Congress, as virtually every late-filed TILA claim could, under such an interpretation, elude the application of the limitations provision through a claimed equitable tolling.

Id. (citing Hughes v. Cardinal Federal Sav. & Loan Ass'n, 566 F.Supp. 834, 838 (S.D. Ohio 1983)).  "The issue becomes whether [the plaintiff] has shown a triable issue of fact concerning her contention that the limitations period should be equitably tolled because the Defendant, in her view, fraudulently concealed the existence of her claim."  Evans, 39 F. Supp. 2d at 1181-82.

In their Complaint, Plaintiffs allege that Defendants failed to make the following material disclosures at the time of the transactions at issue here: the creditor, amount financed, finance charges, annual percentage rate, payment schedule, total payments, and the fact that a security interest was being taken. (Compl. ¶ 154.)  Their equitable tolling argument, however, focuses specifically on an allegation that Defendants charged an unspecified finance charge in connection with the escrow accounts set up to make payments under the

Contract for Deed.  Plaintiffs claim that they only learned of this finance charge

on June 30, 2008, when they received their first and only statement from Prime

that substantially understated the expected funds in the escrow account.  Based

on Defendants' failure to provide statements disclosing the amount of funds

remaining in the escrow account, the Court concludes that Plaintiffs have raised

a triable issue of fact concerning whether the Smiths and Prime fraudulently

concealed the payment of an undisclosed finance charge.  Because there is a

genuine issue of fact on this claim, the Court denies both Plaintiffs' and Prime's

cross motions for summary judgment.

### 3.  HOEPA Damages Claim

Plaintiffs also raise a damages claim under the HOEPA, which regulates

closed-end loans made and high annual percentage rates or with excessive costs

and fees.  15 U.S.C. § 1639; 15 U.S.C. § 1602 (aa).  Section 1639(a)(1) outlines what

disclosures are necessary for mortgages defined under section 1602(aa).  But a

section 1602(aa) mortgage requires "a consumer credit transaction that is secured

by the consumer's principal dwelling, other than a residential mortgage

transaction, a reverse mortgage transaction."  16 U.S.C. § 1602(aa).  As discussed

above, the Subject Property here is not a consumer's principal dwelling for any of

the Plaintiffs in this case and therefore provides no basis for Plaintiffs' HOEPA

damages claim.  See 12 C.F.R. 226.32(a).  Accordingly, Prime is thus entitled to summary judgment and Plaintiffs' motion is correspondingly denied.

### D. Count 4: Violation of Foreclosure Purchaser Statute, Minn. Stat. §§ 325N.10-.18

Minnesota's Foreclosure Purchaser Act regulates real estate transactions involving a "foreclosed homeowner" who enters into a "foreclosure reconveyance" with a "foreclosure purchaser."  See Minn. Stat. § 325N.10.  A foreclosed homeowner, however, is defined as "an owner of residential real property, including a condominium, that is the primary residence of the owner and whose mortgage on the real property is or was in foreclosure."  Id.

By virtue of the Smiths' failure to respond to Plaintiffs' request for admissions, Plaintiffs argue that the following facts are undisputed: (1) Plaintiffs were a "foreclosed homeowner" on February 21, 2007; (2) the transaction involved "foreclosure reconveyance;" and (3) the Smiths are each a "foreclosure purchaser" as defined in section 325N.10.  Furthermore, Plaintiffs contend that it is also undisputed that the Smiths failed to comply with Minn. Stat. § 325N.11 and § 325N.12(8) by failing to verify Plaintiffs' ability to repay the amounts set forth in paragraph 4 of the contract for deed.

However, it has already been determined that the Hartmans had no ownership interest in the Subject Property pursuant to the August 3, 2006 quitclaim deed, and that the Subject Property was not Maul Lee Hartman's primary dwelling during the time of the transactions at issue here. Consequently, the Court denies Plaintiffs' request for partial summary judgment on this claim.

### E.  Count 10 – Common law Fraud.

To succeed in a common law fraud claim in Minnesota, a plaintiff must show: (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false;  (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the  party suffer pecuniary damage as a result of the reliance."  Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 368 (Minn. 2009).  "One who speaks must say enough to prevent his words from misleading the other.  One who has special knowledge of material facts to which the other party does not may have a duty to disclose these facts to the other party."  Boubelik v. Liberty State Bank, 553 N.W.2d 393, 398 (Minn. 1996).

Plaintiffs argue that representatives at Prime were closely involved with the Smiths and Midwest Equity and therefore failed to inform the Hartmans that the arrangement was not a loan, but rather an equity-stripping operation.  Prime responds, arguing that it had no involvement with the February 2007 transaction when Plaintiffs transferred title to the Smiths.  Furthermore, Prime contends that its employees made no representations to Plaintiffs in connection with the August 2007 and November 2007 transactions.   Based on the Court's close reading of all of the evidence on the record, it determines that there are genuine issues of fact involving the representations made by Defendants during these transactions, and also that the relationship between the individual Defendants in constructing this lending arrangement.  As a result, the Court denies both Plaintiffs' and Prime's cross motions for summary judgment on this claim.

**F.   Count 11: Originating a Mortgage Loan with Points and Fees in Excess of 5%**

Although Plaintiffs have moved for summary judgment on Count 11, they have neglected to make any mention about it in their supporting memorandum and reply.  As a result, the Court denies their motion.

**G. Smiths' Unjust Enrichment Counterclaim**

Plaintiffs insist that they are entitled to summary judgment on the Smiths' counterclaim alleging unjust enrichment.  In their request for admissions Plaintiffs asked the Smiths to admit they have no facts establishing that Plaintiffs have been inequitably or unjustly enriched under the February 2007, August 2007, or November 2007 transactions.  The Smiths have not denied or otherwise responded to the request or to Plaintiff's motion.  As a result, the Court determines that the Smiths have abandoned this claim and hereby dismisses it from this litigation.

### V.      Costs & Attorney Fees

Finally, Plaintiffs have not set forth any basis for the Court to award them costs and disbursements, nor any basis for leave to file a separate application for attorney fees.  As a result, the Court denies Plaintiffs' request.

### VI.     ORDER

Based on the files, proceedings, and arguments in the record, the Court **hereby ORDERS** that Defendant Prime's Motion for Summary Judgment [Docket No. 21] is **GRANTED IN PART and DENIED IN PART** and Plaintiffs' Motion for Partial Summary Judgment [Docket No. 30] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. The Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment on Count 1 and declares that the February 21, 2007 transaction constituted an equitable mortgage, rather than the sale of property.

2. In Count 2, Plaintiffs' TILA rescission and HOEPA damages claims in are **DISMISSED WITH PREJUDICE**, but summary judgment is **DENIED** as to Plaintiffs' TILA damages claim because the Court finds a genuine issue of fact as to whether Defendants' fraudulently concealed the existence of an undisclosed finance charge in the transactions at issue here.

3. Plaintiffs' Motion for Partial Summary Judgment on Count 4 is **DENIED**.

4. Defendant's Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment on Count 10 are **DENIED**.

5. Plaintiffs' Motion for Partial Summary Judgment on Count 11 is **DENIED.**

6. Plaintiffs' Motion for Partial Summary Judgment on the Smiths' Counterclaim is **GRANTED** and the Counterclaim is hereby **DISMISSED WITH PREJUDICE.**

7. Plaintiffs' request for an Order granting their costs and disbursements, as well as leave to file a separate application for reasonable attorney fees is **DENIED.**

Date: September 17, 2010                    s/ Michael J. Davis
                                            Michael J. Davis
                                            Chief Judge
                                            United States District Court